BLUE MOUNTAINS BIODIVERSITY PROJECT, a Project of League of Wilderness Defenders, a non-profit corporation; Plaintiff,

v.

UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, Dale Bosworth, in his official capacity as Chief of the Forest Service; Harv Forsgren, in his official capacity as Regional Forester for Region 6 of the United States Forest Service; Bonnie J. Wood, in her official capacity as Forest Supervisor for Malheur National Forest; Defendants.

No. CIV.01–703–HA.

United States District Court,
D. Oregon.

Sept. 6, 2002.

Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, Jamie B. Jefferson, Wild Earth Advocates, Berkeley, CA, Julia A. Olson, Wild Earth Advocates, Oakland, CA, for Plaintiff.

Jason Cohen, Wildlife & Marine Resources Section, United States Department of Justice, Sarah D. Himmelhoch, United States Department of Justice, Environment and Natural Resources Div., General Litigation Section, Washington, DC, Michael Mosman, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, OR, for Defendants.

## OPINION AND ORDER

HAGGERTY, District Judge.

Plaintiff and defendants have moved for summary judgment. Oral argument on these motions was heard on July 1, 2002. For the following reasons, plaintiff's motion for summary judgment is granted, and defendants' motion for summary judgment is denied.

**BACKGROUND**

Plaintiff challenges a Decision Notice and Finding of No Significant Impact ("DN/FONSI") the Forest Service issued on June 26, 2000, implementing plans to control the spread of—and eradicate—noxious weeds on a portion of the Malheur National Forest. The Decision reviews defendants' consideration of three alternatives for attempting to control non-native species of vegetation and their adoption of "Alternative 2," which provides for a mixture of manual, biological and chemical controls. According to the project, such controls are to be applied over the next five years to 1,389 acres on the Malheur National Forest, and of that, up to 777 acres are to be sprayed repeatedly with as many as four different herbicides. Within the 777 acres, only 259 acres are currently infested with noxious weeds, but the additional acreage is included because the Forest Service anticipates the spreading of the noxious weeds.

Plaintiff seeks summary judgment and injunctive relief, asserting the Forest Service's Environmental Assessment ("EA"), Decision Notice ("DN") and FONSI regarding the Noxious Weed Control Project on the Malheur National Forest are all insufficient under the National Environmental Policy Act ("NEPA") because: (1) the Forest Service violated NEPA by failing to consider a reasonable range of alternatives for the project; (2) the Forest Service violated NEPA by failing to consider significant impacts; and (3) the Forest Service violated NEPA by failing to conduct a Supplemental Environmental Impact Statement (SEIS). Plaintiff also alleges the Forest Service violated the National Forest Management Act ("NFMA") by proceeding without ensuring the viability of sensitive species by obtaining updated population surveys.

Defendants emphasize that the project in dispute affects only a tiny portion of the Malheur National Forest's 1,500,000 acres. As noted above, the maximum area that could be treated is 777 acres, an estimate based upon an assumption that weed patches may spread to three times their current size. Defendants say the majority of treatment sites are less than a tenth of an acre, and 82 percent of the sites is in "non-pristine" areas such as roadsides, quarries and similarly disturbed areas. The total of the project sites comprises .02 percent of the total acreage on the Forest.

Herbicides are to be applied with backpack sprayers, and only on established infestations where past treatments were ineffective, using area- or plant-specific methods. Mitigation efforts include public warning signs, applying herbicides by hand in low wind conditions, prohibiting applications in sensitive areas, and not ap-

plying when rain is forecast within 48 hours.

Defendants contend they elected to use herbicides as a last resort and took into consideration plaintiff's concerns. Defendants also move for summary judgment, contending: (1) the administrative record supports their decisions (and plaintiff fails to establish that the circumstances in this case are exceptional enough to permit the court to go beyond the record and consider other evidence); (2) defendants' "mitigation efforts" are sufficient to create an adequate buffer against possible negative impacts resulting from the project, eliminating concern for significant impacts and any need for a SEIS; (3) defendants' scope of alternatives was adequate, as it included what it refers to as a "prevention only" alternative that was properly dismissed by defendants because it did not address the problem of controlling weeds already present on the forest; and (4) there was no NFMA violation because the Forest Service is not required to obtain updated species population surveys, but was permitted to proceed with the project while relying upon a Biological Evaluation.

## PROCEDURAL BACKGROUND

■ The National Environmental Policy Act requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Act "ensures that the agency... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

A threshold question in any NEPA case is whether a proposed project will "signifi-

cantly affect" the environment, thereby triggering the requirement for an EIS. An agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact [FONSI]." *Id.*

■ The Ninth Circuit recognizes that an EIS "must be prepared if 'substantial questions are raised as to whether a project... may cause significant degradation of some human environmental factor.'" *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998), quoting *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998) (internal citation omitted).

On April 5, 2000, Bonnie J. Wood of the John Day Ranger District issued an EA for the Malheur project at issue in this case. The purpose of the project was identified as follows: "to control the spread and eradicate weeds over time on the Forest."

This EA was "tiered" to an EIS completed in 1988 known as the "Managing Competing and Unwanted Vegetation Plan" (hereinafter the "1988 EIS"). "Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared." 40 C.F.R. § 1508.28.

The EA evaluated three alternatives to control the weeds—1), a "no action" alter-

native; 2), an alternative calling for a mixture of manual, biological and chemical controls; and 3), an alternative relying upon manual and biological controls only. There were no alternatives regarding a specific "prevention" alternative. Plaintiff submitted comments on the EA.

On June 26, 2000, Ranger Wood issued a Decision Notice/FONSI implementing Alternative 2 (using a mixture of manual, biological and chemicals). The Decision concluded "Alternative 2 offers the best long-term strategy to manage noxious weeds." A.R. vol. 10 at 683. As reviewed above, the plan indicates treatment for up to 1,389 acres on the Malheur National Forest, and chemical spraying of up to 777 acres. While the Decision acknowledged Alternative 2 "may have a greater potential to pose risks to human health and the environment than other alternatives," it referred to the mitigation measures required in the 1988 EIS in concluding that the Decision's potential adverse effects would be "minimal." Based upon that conclusion, the Decision declared that a Supplemental EIS was unnecessary. DN/FONSI at 2.

Plaintiff exhausted administrative remedies appealing this decision, contending that the herbicides selected were chosen only because they were included in the 1988 EIS, and that the Forest Service improperly ignored the post–1988 development of more effective, less toxic herbicides. Defendants rejected plaintiff's appeal, and plaintiff brought this suit. At the hearing on the parties' motions, this court concluded plaintiff has standing to bring the suit on grounds that the Forest Service's decision to implement the project could cause plaintiff and its members injuries that are within NEPA's zone of interests, and plaintiff is a nonprofit group dedicated to protecting public lands from the adverse effects of herbicide use. Additionally, this court has the authority to set

aside illegally issued agency actions. *See* 28 U.S.C. § 1332; 5 U.S.C. § 706(2)(A).

## ANALYSIS

Plaintiff's motion for summary judgment challenges defendants' action with three major arguments. Plaintiff asserts: (1) the current DN/FONSI should be deemed invalid because its scope of reasonable alternatives was too narrow and because it failed to evaluate significant impacts; (2) the Forest Service violated NEPA by failing to prepare a new, or Supplemental, EIS; and (3) the Forest Service violated the National Forest Management Act by failing to ensure the maintenance of viable populations of sensitive species. These are addressed below.

**(1) Is the DN/FONSI invalid because its scope of reasonable alternatives was too narrow and because it failed to evaluate significant impacts?**

Plaintiff first contends defendants failed to conduct the required "rigorous exploration and objective evaluation" of "all reasonable alternatives" in its EA, because despite describing the purpose of the proposed action as being "to control the spread and eradicate noxious weeds over time on the Forest," the EA failed to consider any alternative that included *preventative measures* to control the spread of and eradicate noxious weeds. Besides the "no action" alternative, the only other two alternatives involved actions (manual, biological and chemical, or just manual and biological) that fail to address the causes of noxious weed infestation. Plaintiff argues at least one alternative should have addressed preventing the spread and reintroduction of noxious weeds.

Plaintiff also challenges the EA's alleged failure to disclose and evaluate the project's significant environmental impacts. Plaintiff complains defendants

failed to provide sufficient information about the herbicides being used, and failed to provide a map of the project area or identify the weed treatment sites. These failures precluded the public from "cross checking" the project with other impacts, such as grazing, timber sales and controlled burns. Further, plaintiff argues defendants have not gathered relevant scientific data regarding the impact of herbicides since preparing the 1988 EIS, rendering defendants' decision to issue this FONSI arbitrary and capricious. Plaintiff also alleges a failure to survey for sensitive, federally listed plant and animal species. Finally, plaintiff contends the three paragraphs committed to discussing "cumulative impacts" in the EA are insufficient to meet NEPA's requirement for a "hard look" analysis.

■■■ Defendants respond to these arguments by first challenging plaintiff's attempt to introduce what defendants deem "significant new information" that is not part of the Administrative Record ("AR"). Generally, courts may not consider evidence outside the administrative record. However, "the court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration." *Love v. Thomas,* 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied sub nom. AFL–CIO v. Love,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989) (citation omitted). *See also Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 760 (9th Cir.1996). This exception is recognized because "[i]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980); *see also Thompson v. United States Department of Labor,* 885 F.2d 551, 555 (9th Cir.1989) (courts may consider evidence outside the record when the court is required to determine (1) whether the agency considered all relevant factors; (2) whether the agency's inquiry was sufficient; or (3) the meaning of technical terms or complex issues).

■■■ The evidence at issue consists of several affidavits, declarations and exhibits. The Cox and Belsky Declarations are from undisputed experts and address relevant factors defendants allegedly failed to consider and attempt to underscore why the EA is inadequate. The same is true of the George Wooten Declaration. These declarations also assist the court in explaining complex noxious weed subject matter. The Olsen declaration and accompanying exhibits provide information regarding the extent of information available to the defendants. This court concludes plaintiff is entitled to submit evidence to prove the existence of new information the Forest Service failed to consider. *See Friends of Clearwater v. Dombeck,* 222 F.3d 552, 558 (9th Cir.2000). The new evidence is allowed on grounds that the court needs to determine whether defendants considered all relevant factors and whether its inquiry was sufficient.

■■■ Defendants next dismiss plaintiff's prevention concerns as being "outside the scope of the proposed action," which the Forest Service asserts is controlling only the weeds already present on the forest. Defendants contend prevention issues would be better addressed when other kinds of management activities are proposed in the future. Defendants contend plaintiff's allegation that they failed to consider an alternative that included prevention concerns is a "moribund challenge" because the project's purpose is to eradi-

cate the presence of weeds, and prevention alone fails to do that.

While the description of the project's purpose identifies an intent "to control the spread" of weeds, defendants construe this in context of "the description of the desired condition," which is the goal of eliminating weed infestations at the project sites. Since the Forest Service hopes to "control weeds already present on the Forest," it asserts it acted reasonably in not emphasizing prevention. Furthermore, the Decision Notice comments that "mitigation measures are incorporated in Alternative 2 to avoid impacts to public health, water quality, wildlife and rare plants, *and to prevent weeds from recurring in treated areas.*" A.R. Vol. 10, 683.

As to the sufficiency of defendants' evaluation regarding possible "impacts" of the project, defendants argue their decision validly relied upon the 1988 EIS, plus other resources, including: a 27–page Biological Evaluation prepared by three professionals at the Forest Service, herbicide profile sheets, "and other substantial and newer information" such as "risk assessments prepared under contract by Syracuse Environmental Research Associates, Inc." Defendants Opposition at 7–9. Defendants argue there are reasonable mitigation measures in the project that are "specifically designed to reduce or eliminate to the greatest extent possible the potential effects of the proposed action." *Id.* at 7.

After studying the parties' memoranda, and considering the arguments presented during the motions hearing, this court concludes the defendants failed to take the requisite "hard look" and adequately consider reasonable alternatives involving prevention of weed infestation when preparing the EA. The court agrees with two points made in public comments to the EA: that prevention was intended to be an integral part to the 1988 EIS, to which this project

is tiered, and that weed control—an explicit part of the EA's purpose—is impossible without acknowledging significant sources of weed introduction, such as the fact that 111,000 cows coming on to the forest is a "major seed transport system." *See* A.R. vol. 10, 680–81. Defendants concede prevention measures were not emphasized in the alternatives, but assert their focus was on the goal of eliminating weed infestations at the project sites. While it may be true that defendants chose to focus upon weed eradication, the purpose statement of the EA also plainly calls for controlling weeds. The Decision Notice's reference to prevention in the mitigation measures that are incorporated in Alternative 2 is inadequate to fulfill defendants' obligations to weigh an obviously reasonable alternative that promoted preventative measures for controlling weed infestation.

The failure to consider a reasonable alternative can thwart NEPA's two primary goals: insuring the agency has fully contemplated the environmental effects of its action; and insuring the public has sufficient information to challenge the agency. *See Idaho Sporting Congress,* 137 F.3d at 1151. This court has recently addressed a similar dispute in concluding the Bureau of Land Management erred in refusing to consider an alternative that banned cattle grazing while trying to address wild river management:

> Noticeably absent from the EA is an alternative which simply eliminates cattle grazing, without compromising the rivers' scenic, geologic, wildlife and cultural values. The EA contains no explanation of why this alternative was not considered: certainly it is an obvious "reasonable alternative." Apart from the failure to consider an obvious reasonable alternative, analysis of Alternatives B and C convinces the court that the BLM avoided the necessity of taking a "hard look" at grazing in its preferred

alternative by setting up two straw men for comparison: alternatives completely at odds with the WSRA's policy objectives of protecting and enhancing the river values and maintaining the river in a manner consistent with its designation as "wild."

*Oregon Natural Desert Ass'n v. Singleton,* 47 F.Supp.2d 1182, 1195 (D.Or.1998). While there are some factual distinctions between *Singleton* and this case, defendants here failed—as did the defendants in *Singleton*—to articulate a reason for disregarding an obviously reasonable alternative that addressed preventative measures, and did not conduct a rigorous exploration and objective evaluation of all reasonable alternatives in the EA. Instead, none of the EA's alternatives included a meaningful consideration of prevention strategies, and the Forest Service selected a preferred alternative among two action alternatives that relied on combinations of manual and herbicidal methods for eradication—without addressing the crucial aspect of control by prevention. The court rejects defendants' position that the project scope can be fairly construed as emphasizing eradication over control, and concludes that their failure to address prevention in any action alternative was unreasonable and indicative of a greater failure to take a hard look and render an adequately reasoned choice. Accordingly, plaintiff is entitled to summary judgment and relief.

**(2) Did the Forest Service violate NEPA by not preparing a Supplemental EIS?**

■ Plaintiff also contends defendants erred by relying upon the 1988 EIS instead of preparing a Supplemental EIS for this project. Plaintiff asserts the 1988 EIS cannot account for the impact of the planned herbicide applications, and the mitigation measures provided in the 1988 EIS should have been reviewed and updated with current information about herbicides and their effects.

Defendants contend they are "bound" by a previous court decision regarding their choice of herbicides. In 1983 environmentalists won a lawsuit challenging defendants' initial EIS regarding the management of unwanted vegetation, and an injunction was entered prohibiting defendants from implementing its plan. Defendants completed the 1988 EIS following this injunction. The injunction was dissolved following a mediated agreement that specified the 13 herbicides defendants were permitted to use. Defendants contend they are now limited to choosing from these 13.

Plaintiff acknowledges that the 1988 EIS limits the herbicides from which defendants may choose. However, plaintiff contends this merely underscores the need for a SEIS, in light of the advances regarding understanding the effectiveness and dangers of herbicides.

The Ninth Circuit has addressed when a Supplemental EIS is required:

NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement serves a dual role: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Stated differently, NEPA's purpose is to ensure that "the agency will not act on incomplete infor-

mation, only to regret its decision after it is too late to correct." *Marsh v. Oregon Natural Resources Council*, 490 U.S. [360,] 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 [(1989)].

In view of this purpose, an agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a "hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval." *Id.* at 374 (citations and quotations omitted). It must "ma[ke] a reasoned decision based on... the significance—or lack of significance—of the new information," *id.* at 378, and prepare a supplemental EIS when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). "If there remains major Federal action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh*, 490 U.S. at 374, 109 S.Ct. 1851 (citations and quotations omitted).

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556–58 (2000) (footnote omitted).

 An agency "need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Headwaters v. BLM*, 914 F.2d 1174, 1177 (9th Cir.1990) (footnotes and citations omitted). The court in *Headwaters* continues:

However, an agency is not free to ignore the possible significance of new information. Rather, NEPA requires that the agency take a "hard look" at the new information to determine whether an SEIS is necessary. *Id.* at 1859, 1865. The agency decision whether new information requires an SEIS is reviewed under the arbitrary or capricious standard. *Id.* at 1860 (whether to file an SEIS "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise"). [I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." * * * [I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency[ ]... without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information.

*Id.*, citing *Marsh*.

The 1988 EIS was focused upon vegetation management in conjunction with "silvicultural operations," not noxious weed management. Significant, relevant new information has been developed and made readily available in the 14 years since the 1988 FEIS was prepared, including literature addressing the following significant issues: (1) the causes and increasing spread of noxious weeds (especially by cattle, not understood or addressed in 1988); (2) evidence of the neuro and immunotoxicity of herbicides (the 1988 EIS acknowledged there was at the time insufficient information about these toxicities and

that over time new studies would "change estimates of health effects"); (3) toxic effects and increased susceptibility of amphibians; (4) endocrine disruption caused by herbicides (now understood to be a consequence of herbicide use, but unaddressed in 1988); (5) effects from additives to herbicide full formulations (the impacts from surfactants that are added to the herbicides were unaddressed in 1988 but are now known to have severe toxicity); (6) metabolites, the breakdown product of herbicides (unaddressed in 1988 but recognized as an impact today) and (7) the availability of new species specific herbicides (newer herbicides may be safer and more effective than those available in 1988).

This court concludes the 1988 EIS inadequately addresses these subjects, as well as the extent to which noxious weeds disrupt biodiversity. The court rejects defendants' position that the information developed since 1988 was either included in part in the EA's analysis, or has been rendered moot by the "mitigation measures" limiting the scope and methods of herbicide spraying. It is true that mitigation measures can provide an adequate buffer against the negative impacts that result from authorized activity, rendering an EIS unnecessary. *See Wetlands Action Network v. United States Army Corps of Engineers,* 222 F.3d 1105, 1121 (9th Cir.2000). Although the cited mitigation measures minimize or prevent some of the risks presented in the project, defendants' decision that a new EIS was unnecessary is nevertheless arbitrary and capricious in light of the extent of the new information at issue. Mitigation measures should not be relied upon for evading the completion of a new EIS if the mitigation pertains to the application of herbicides that are possibly outdated or much more dangerous and less effective than other, more recently available herbicides. Plaintiff is entitled to summary judgment on the issue of the

necessity of a new or supplemental EIS, as well.

**(3) Did the Forest Service violate the National Forest Management Act by failing to ensure the maintenance of viable populations of sensitive species?**

The parties agree that under the NFMA, the Forest Service has the obligation to ensure viable populations, and must act in ways that will ensure no significant declines in species viability. Courts defer to an agency's expertise and shall review its interpretation of its own regulations solely to see whether that interpretation is arbitrary and capricious. *See Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 760 (9th Cir.1996); *see also* 5 U.S.C. § 706(2)(A). This deference is particularly appropriate when questions of scientific methodology are involved. *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (courts defer to agency expertise on questions of methodology unless the agency has failed to address some factor which was essential to a truly informed decision whether or not to prepare an EIS) (citation omitted); *see also Sierra Club v. Marita,* 46 F.3d 606, 619–20 (7th Cir.1995) (Forest Service's failure to use "conservation biology" methodology when conducting population viability analysis was not found to be arbitrary or capricious). The Forest Service's interpretation should be upheld unless it is plainly erroneous or inconsistent with the regulation. *Inland Empire Public Lands Council,* 88 F.3d at 760.

Plaintiff asserts defendants failed to adequately analyze whether the project would contribute to the loss of viability in sensitive species. Malheur National Forest is home to five sensitive terrestrial species and three sensitive aquatic/amphib-

ian species. Defendants addressed their responsibilities regarding these species in a "Biological Evaluation" ("BE") prepared by three agency experts, and in developing mitigation measures designed to reduce the project's risks presented to the species.

Plaintiff argues the BE is inadequate as it fails to make any reasonable effort to identify the population size and location of the species at issue, to employ baseline data for the species, to estimate "population trends" for the species, or to make this information available to the public. Plaintiff rejects the mitigation measures as constituting bare lists of good agency practices, and for failing to be specific regarding protection of the species. There are no disclosures of acreage required for species survival, or the impacts of each alternative on that acreage.

Clearly, the NFMA imposes substantive duties on the Forest Service, one of which is the duty to "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B). In *Inland Empire Public Lands*, 88 F.3d at 759, the Ninth Circuit addressed the minimum acceptable analysis of viability. In that case, the Forest Service conducted extensive field studies evaluating the territories of species and calculating the percentages needed for survival. These were subjected to agency and public review in an EIS. The Forest Service conducted careful analyses for some species, but was not as detailed in its analysis of other species. *See id.* at 759–60 (as to the flammulated owl, the Service noted there was enough acreage of habitat for three potential owl territories, and that the proposed timber sales would reduce the size of one of those territories; as to the bull charr trout, the Service stated timber sales would not appreciably raise the sediment or carbonate levels in those streams occupied by the fish. The Service conducted no analysis at all for the wet-sloped cutthroat trout.)

The Ninth Circuit concluded the Forest Service adequately discharged its duties in *Inland Empire*. Plaintiff distinguishes the analyses described in *Inland Empire* from defendants' conduct, since defendants have performed no mathematical calculations, and have not completed real viability studies throughout the Forest for several years. Instead, as plaintiff points out, defendants merely continue recommending "future monitoring."

While this court remains concerned about the thoroughness of defendants' analyses regarding their responsibilities under NFMA, it is unable to conclude as a matter of law that defendants were arbitrary and capricious by relying upon the Biological Evaluation prepared by three agency experts, and developing mitigation measures designed to reduce the project's risks presented to the species. The decision in *Inland Empire* teaches there is no formula to apply in determining compliance with NFMA. Because of the likelihood that defendants will prepare a new EIS and arrive upon revised mitigation measures in the wake of this ruling, the court expects that in the course of proceeding, defendants will scrutinize their responsibilities under NFMA and will evaluate how best to comply with them.

## CONCLUSION

For the reasons provided, plaintiff's motion for summary judgment (# 32) is granted in part, and defendants' motion for summary judgment (# 45) is denied. Entry of Judgment is stayed pending the parties' compliance with the following instruction. Counsel for the parties shall attempt to draft a joint proposed Judgment in this matter. This proposal shall be filed with the court not later than September 27, 2002, accompanied by a computer disk containing the proposal format-

ted for WordPerfect. If the parties are unable to agree upon a joint proposal, each party shall file a proposed Judgment (accompanied with the document on a computer disk) by September 20, 2002. Objections to these proposals must be filed by September 27, 2002.

IT IS SO ORDERED.