**KLAMATH–SISKIYOU WILDLANDS CENTER, Environmental Protection and Information Center, and Klamath Forest Alliance, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, Defendant.**

No. CIV.S.03–1334FCDDAD.

United States District Court,
E.D. California.

Oct. 15, 2004.

Sharon Eileen Duggan, Berkeley, CA, Marianne Dugan, Pro Hac Vice, Facaros and Dugan, Eugene, OR, for Plaintiffs.

## MEMORANDUM AND ORDER

DAMRELL, District Judge.

This matter is before the court on cross motions for summary judgment filed by plaintiffs, Klamath–Siskiyou Wildlands Center, Environmental Protection and Information Center, and Klamath Forest Alliance (collectively "plaintiffs") and defendant, United States Forest Service, ("Forest Service").[1] The court heard oral argument from parties' counsel on July 16, 2004.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Beaver Creek Project

The present controversy surrounds the Beaver Creek Project ("the Project"), a timber harvest/watershed improvement

---

1. The court grants plaintiff's July 26, 2004 motion to supplement the record to add color photographs inadvertently omitted from the original record. The Forest Service does not oppose this motion. (Aug. 13, 2004 letter from David Negri.) Defendant does oppose plaintiffs' citation to additional authority in the cover letter attached to her motion. The court disregarded and did not rely on plaintiff's letter in deciding this matter.

project located in the Beaver Creek Watershed, which lies within the Scotts River Ranger District of the Klamath National Forest, approximately fifteen miles northwest of Yreka, California.

The Klamath National Forest encompasses approximately 1,700,000 acres of federal lands in Northern California and Southern Oregon. Within the Klamath National Forest, the 69,600–acre Beaver Creek Watershed drains, through Beaver Creek and a number of other tributaries, into the nearby Klamath River. The Beaver Creek Watershed is a checkerboard of public (approximately 64%) and private land, much of which has been heavily impacted by logging, grazing, and road construction. (*See* Beaver Creek Ecosystem Analysis 1996 at 1; AR 2751.) The 11,-362–acre Beaver Creek Project area ("project area") lies in the eastern portion of the Beaver Creek Watershed.

As outlined, the project would harvest 5,940,000 board feet of lumber from 1,354 acres in harvest units scattered throughout the project area, generating $ 541,000.00 for associated watershed improvement projects. (EA at 19; AR 378.) Specifically, the project entails:

2. Commercial Thinning is a silviculture treatment that 'thins' an overstocked stand by removing trees that are large enough to be commercially viable products. Commercial Thinning is conducted to improve the health and growth rate of the remaining trees. (*See* Fish BA at 5; AR 981.)

3. Green Tree Retention, is a timber harvest method in which 15% of the trees per acre are left standing, primarily in clumps. Green Tree Retention is considered preferable to complete clear-cutting in promoting diversity of future stands. *See Epiphytes and Forest Management*, Do remnant trees promote maintenance of old-growth associated lichens? http://oregonstate. edu/-mccuneb/ remnantwhy.htm.

4. Group Selection is a harvest method that incrementally harvests the designated area in

*Timber Harvest*

- Timber harvest on 975 acres ("harvest area"). Methods of harvest include Commercial Thinning [2] on 808 acres, including 477 acres of Northern Spotted Owl Critical Habitat ("Spotted Owl CH") and nine acres of geologically-defined Riparian Reserves; Green Tree Retention [3] on 77 acres; Group Selection [4] on six acres; Salvage and Sanitation [5] on 83 acres, including 44 acres of Spotted Owl CH; and Overstory Removal [6] on one acre. Pre-commercial thinning [7] will occur on ten acres within the harvest area and 379 acres outside of the harvest area, including 15 acres of Spotted Owl CH and 79 acres of designated Riparian Reserves.

- Harvested timber would be removed through a combination of traditional Tractor systems (500 acres), and Skyline Cable systems (475 acres) in primarily steep-sloped areas. (EA at 2; AR 361.)

- After harvest, 74 acres will be reforested. Gopher baiting will occur on 46 acres to protect newly planted trees.

phases. 15–20% of the stand is removed at one time, in patches of up to 3/5 acre, and the remaining 80–85% is thinned. At the next Group Selection phase, another 15–20% of the unit is harvested. (*See* Fish BA at 7; AR 983.)

5. Sanitation and Salvage is a treatment that removes diseased, dying and dead trees. (Fish BA at 7; AR 983.)

6. Overstory Removal harvests mature trees from an "overstocked mid-canopy layer." (Fish BA at 7; AR 983.)

7. Precommercial Thinning removes some trees of less than merchantable size from a stand so that remaining trees will grow faster. (See Fish BA at 7; AR 983.)

*Fire Suppression*

- Fire suppression activities involve burning of accumulated fuels through a variety of methods, including Underburn (674 acres, including 255 acres of Spotted Owl CH); Tractor Pile and Burn (247 acres); Hand Pile and Burn (10 acres); and Broadcast Burn of slash (38 acres).

*Road–Related Activities*

- Four temporary spur roads (total .24 miles) would be constructed for access to timber harvest. Newly reconstructed roads would be decommissioned after harvest.

- 3.85 miles of existing non-Forest System roads would be reopened for access to timber harvest areas. Reopened roads would be decommissioned after timber harvest.

- Approximately four miles of roads would be decommissioned.

- Road improvement activities would occur on twelve roads.

- Road closure, both seasonal and year-round, would occur on three roads.

- One non-system road would be added to the National Forest System. (EA at 1–3; AR 360–362.)

## 2. Regulatory Framework

Forest planning decisions are impacted by several overlapping statutory and regulatory regimes.

### National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. § 4321, et seq., ("NEPA"), was enacted by Congress in 1969 to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; promote efforts which will prevent or eliminate damage to the environment . . . [and] to enrich the understanding of the ecological systems and natural resources important to the nation. . . ." 42 U.S.C. § 4321. Despite this ambitious declaration of purpose, NEPA has been interpreted as essentially procedural. *See Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998)("noting that the purpose of NEPA is to 'ensure a process, not to ensure any result.'") The NEPA process is designed to "ensure that the agency . . . will have detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Blue Mountains,* 161 F.3d at 1212.

### National Forest Management Act

The National Forest Management Act of 1976, 16 U.S.C. § 1604, et seq., ("NFMA"), requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 90 Stat. 2949, as renumbered and amended, 16 U.S.C. § 1604(a). As of 1998, the System included 155 national forests, 20 national grasslands, 8 land utilization projects, and other lands that together occupy nearly 300,000 square miles of land located in 44 States, Puerto Rico, and the Virgin Islands. § 1609(a); 36 C.F.R. § 200.1(c)(2) (1997); Office of the Federal Register, United States Government Manual 135 (1997/1998). The Forest Service, which manages the System, develops land and resource management plans pursuant to NFMA, and uses these forest plans to "guide all natural resource management activities," including use of the land for "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 36 C.F.R. § 219.1(b); 16 U.S.C. § 1604(e)(1). In developing forest plans, the Service must take both environmental and commercial goals into account. *See,* e.g., 16 U.S.C. § 1604(g); 36 C.F.R. § 219.1(a) (1997).

Forest planning occurs at two levels: forest and project. At the forest level, the Forest Service develops a Forest Plan, which is a broad, long-term programmatic planning document for an entire National Forest. Each Forest Plan includes goals and objectives for individual units of the forest and provides standards and guidelines for management of forest resources. Consistent with its obligations under the NFMA, in 1995, the Forest Service adopted the Klamath National Forest Land and Resource Management Plan ("KLRMP"), which provides standards and guidelines for project level planning within the Klamath National Forest. Because the project lies within the Klamath National Forest, it must be consistent with the KLRMP.

### Northwest Forest Plan

Established in 1994 amid the controversy surrounding the northern spotted owl, the Northwest Forest Plan (NFP) was developed to provide an integrated, comprehensive approach to ecosystem management, intergovernmental and public collaboration, and rural community economic assistance for federal forests in western Oregon, Washington, and northern California. The NFP covers nearly 24.5 million acres of federal lands. The NFP amended the planning documents for 19 national forests and seven BLM districts, including the KLRMP for the Klamath National Forest.

The NFP allotted lands to various reserves and management categories and established standards and guidelines for activities on those lands. The core of the

conservation component of the NFP is an extensive system of reserves, which comprise 78% of the planning area. This includes 8.8 million acres of lands which were congressionally or administratively withdrawn. Another 7.4 million acres were designated late successional reserves (old growth forests) and 2.6 million acres were designated as riparian reserves. With some exceptions, these lands are essentially off-limits for timber harvest. The remaining 5.5 million acres, or 22% of the total area, are designated as "adaptive management areas" or "Matrix" lands. These areas are available for timber harvest

In addition to the specific forest management requirements described above, the NFP contains an Aquatic Conservation Strategy ("ACS") which sets objectives to "restore and maintain the ecological health of watersheds and aquatic ecosystems" on federal lands. (ROD at B–9, AR 3680.)

In summary, to proceed, the project must be analyzed in accordance with NEPA and consistent with the NFMA, KLRMP, NFP and ACS.

### 3. History of the Beaver Creek Project

The Forest Service formally initiated planning for the project on November 19, 1998. In conjunction with its analysis of project effects, and in compliance with Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq., the Forest Service conducted biological assessments of project impacts on endangered, threatened, proposed, or sensitive wildlife and anadromous fish species potentially impacted by the project.[8] Specifically, the

---

8. Under the ESA, a federal agency must ensure its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Section 7 of the ESA requires that an agency considering action consult with either the Fish and Wildlife Service

("FWS") or the National Marine Fisheries Service ("NMFS") if the agency "has reason to believe that an endangered species or a threatened species may be present in the area" affected by the proposed action, and "implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3);

Forest Service evaluated impacts to four threatened species, the Northern Spotted Owl ("NSO"), Bald Eagle, and Canada Lynx, as well as the Southern Oregon / Northern California Coasts Coho Salmon Evolutionary Significant Unit ("SONCC Coho Salmon"). (Beaver Creek Biological Assessment/Biological Evaluation for Wildlife Species ("Wildlife BA/BE") at 1, AR 1397; Beaver Creek Biological Assessment/Biological Evaluation for Anadromous Fish Species ("Fish BA/BE") at 1, AR 977.) In addition, multiple Sensitive Species were identified as potentially impacted by the project, including the Peregrine Falcon, Northern Goshawk, Willow Flycatcher, Pacific Fisher, California Wolverine, American Marten, Pallid Bat, Townsend's Big Eared Bat, Great Gray Owl, Northwestern Pond Turtle, Foothill Yellow-legged Frog, Cascade Frog, as well as the Trinity/Upper Klamath Evolutionary Significant Unit, Spring-run Chinook Salmon and the Klamath Mountains Province Evolutionary Significant Unit Summer-run Steelhead trout. (*Id.*) The Forest Service evaluated project effects on the aforementioned species in its biological assessments of wildlife and fish and aquatic species and concluded that the project was not likely to adversely affect all but one species, the NSO.

As a result of the Forest Service's determination that the project was likely to adversely affect the NSO, the Forest Service initiated a formal consultation with the Fish and Wildlife Service ("FWS") regarding the impact of the project on species listed as endangered or threatened under the Endangered Species Act, 16 U.S.C. § 1536(a)(2) & (3). In its Biological Opinion ("BiOp"), dated April 26, 2002, the FWS concluded that the project was not likely to jeopardize the continued existence of the NSO or result in adverse modification of critical habitat for this species. (BiOp at 32, AR 648.) In conjunction with this conclusion, the FWS issued an incidental take permit to the Forest Service for three known NSO owl pairs and "an unknown number of owls potentially occurring on 2,955 acres of un-surveyed suitable habitat." (FWS Biological Opinion ("BiOp") at 34, AR 650.)

On March 25, 2002, the Forest Service released an initial Environmental Assessment ("EA"), pursuant to the National Environmental Policy Act ("NEPA"). The EA subsequently was revised, to incorporate additional analysis, and reissued on October 25, 2002. (EA at 1; AR 360.) The EA describes sixteen specific elements of the project's purpose and need, but notes that the primary purpose is watershed restoration and forest health.[9] The

*see also* 50 C.F.R. § 402.14(a). The ESA's implementing regulations provide exceptions to the formal consultation requirement. 50 C.F.R. § 402.14(b). An agency may elect to engage in informal preliminary consultation with the FWS or NMFS to help determine whether the proposed action will result in environmental impacts requiring formal consultation. 50 C.F.R. § 402.13. If, after this informal consultation, the agency and the FWS or NMFS concur that the proposed action is not likely to have an adverse effect on threatened or endangered species, then no further consultation is required. *Id.* Alternatively, the agency may prepare a Biological Assessment evaluating "the potential effects of the action on listed and proposed species and designated and proposed critical habitat" to

determine "whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a). If the Biological Assessment concludes that no listed species or critical habitat is likely to be adversely affected by the planned action, and the FWS or NMFS concurs, then the agency is relieved of the requirement of formal consultation. Id. § 402.12(k)(1). Here, the Forest Service's Biological Assessment concluded that the project "may effect, likely to adversely effect" the NSO. Consequently, formal consultation was required.

9. The stated Purpose and Need is as follows:

1. Implementation of watershed restoration and forest health activities.

EA also analyzed three alternatives in terms of their environmental impacts and success at fulfilling the project's stated "purpose and need." Specifically, the Forest service evaluated two action alternatives (Alternatives 1 and 2) and a "No Action" alternative. (EA at 9–16, AR 368–375.) Alternatives 1 and 2 contained identical quantities of timber harvest, but differed in mitigation measures designed to reduce impacts on an impaired sub-watershed, Hungry Creek, within the project area. (Table 2–2 Summary of Actions, Restrictions and Outputs Proposed by Alternative, EA at 9, AR 368.)

On December 24, 2002, the Forest Supervisor for the Klamath National Forest, Peg Boland, published a Decision Notice and Finding of No Significant Impact ("Decision Notice") in which she selected Alternative 2 for implementation and found that the project as defined would not significantly affect the environment. (Decision Notice and Finding of No Significant Impact ("DN") at 1–14; AR 119–132.) As a consequence of this latter finding, the Forest Service determined that it was not required to prepare an Environmental Impact Statement in accordance with NEPA.

On February 7, 2003 plaintiffs filed a notice of appeal with the Regional Forester, pursuant to 36 C.F.R. 215. On April 24, 2003, the Regional Forester affirmed the Forest Supervisor's decision to implement Alternative 2. Plaintiffs filed the instant litigation on June 23, 2003, challenging the Forest Supervisor's decision under the Administrative Procedures Act.

## STANDARD OF REVIEW

### I. Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of

2. Increase health and vigor in second-growth stands that are overstocked and declining.

3. Accelerate stand development in partial cuts and protect residual stands with good stocking and vigorous tree growth.

4. Create conditions for reintroduction of low-intensity fire; improve stands that have white fir encroachment.

5. Move stands toward a higher pine component commensurate with site type and historic stand composition.

6. Reduce existing hazardous fuels in areas with moderate and high fire behavior.

7. Reduce fuel loading and fire hazard in overstocked stands and stands in poor condition; accelerate development of healthy, large trees.

8. Reduce harvest activity fuels and prepare sites for planting.

9. Capture economic value of current and anticipated tree mortality.

10. To capture economic value of timber, to utilize economic value to help fund watershed restoration activity.

11–13. Minimize resource damage from existing roads, reduce drainage problems, reduce road related sediment production and delivery, reduce road density.

14. To move Hungry Creek, an impaired watershed, closer to recovery.

15. Provide a transportation system that is safe, responsive to public needs, environmentally sound. Consideration of safety and public need of roads.

16. Provide income and employment in rural communities.

(EA at 18–19, AR 377–378.)

showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corporation v. Catrett,* 477 U.S. 317 at 325, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

Where as here, the court's review is limited to the administrative record, stipulated to by the parties, there are no triable issues of fact, and summary judgment is appropriate. *See Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture,* 18 F.3d 1468 (9th Cir.1994).

## II. Administrative Procedures Act

Under the Administrative Procedures Act, 5 U.S.C. § 701, et seq., the court may set aside a final agency actions only where the action is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706. Review under the APA is "searching and careful." *Ocean Advocates v. United States Army Corps of Eng'rs,* 361 F.3d 1108, 1118 (9th Cir.2004). However, the court may not substitute its own judgment for that of the agency. *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)), overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In short, the court must ensure that the agency has taken a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997). As part of this inquiry, the court should ask "whether the [ ] decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Ocean Advocates,* 361 F.3d at 1118. In addition, the court determines "whether the agency articulated a rational connection between the facts found and the choice made." *Id.* at 1118–1119 (quoting *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001)).

## ANALYSIS

Plaintiffs challenge the Forest Service's decision to implement Alternative 2 of the Beaver Creek Project on the basis that this decision violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604.

## I. NEPA Claims

NEPA mandates that federal agencies prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). An EIS must be prepared if "substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor." *Blue Mountains,* 161 F.3d 1208, 1212. In determining whether the proposed project will "significantly effect" the environment, an agency prepares an Environmental Assessment ("EA"), which is "a concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. § 1508.9. Whether there may be a significant effect on the environment requires consideration of two

broad factors: context and intensity, *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir.2001).

Context simply delimits the scope of the agency's action, including the interests affected. Intensity relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry.

NEPA regulations provide relevant factors for evaluating intensity, including, *inter alia:*

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

. . . . .

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

. . . . .

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

. . . . .

(9) The degree to which the action may adversely affect an endangered or threatened species. or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(a)[10]

■■■ The presence of one such factor may be sufficient to deem the action significant in certain circumstances. *Ocean Advocates,* 361 F.3d at 1125. *See also Friends of the Earth v. United States Army Corps of Eng'rs,* 109 F.Supp.2d 30, 43 (D.D.C.2000). "An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to supply a convincing statement of reasons why potential effects are insignificant." *Save the Yaak Committee v. Block,* 840 F.2d 714 at 717. To prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, plaintiffs need not show that significant effects will in fact occur. *Id.* Plaintiffs need only "raise substantial questions whether a project may have a significant effect on the environment." *Id.*

■■■ If, in view of the environmental assessment, the agency concludes that the project will have a significant effect on the environment, the agency must prepare an EIS. 40 C.F.R. § 1501.4. If, on the other hand, the agency makes a finding of no significant impact and does not prepare an EIS, it must "supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mountains,* 161 F.3d 1208 at 1212 (quoting *Save the Yaak Committee v. Block,* 840 F.2d 714, 717 (9th Cir.1988)).

According to plaintiff, the Forest Service's finding of no significant impact was arbitrary and capricious because (1) the project will in fact have a significant effect on the environment, (2) the analysis in the environmental assessment was inadequate, (3) the environmental assessment failed to consider an adequate range of alternatives, and (4) the project does not meet the stated purpose and need.[11]

---

**10.** For sake of brevity, the court omitted factors which are not implicated in this case.

**11.** .The court will not separately address points 2 and 4 with regard to the inadequacy

## A. Significant Effect on the Environment

Plaintiffs contend that the Forest Service abused its discretion by not preparing an EIS because the project will have a significant effect on the environment. Specifically, plaintiffs argue that the project will adversely affect the Northern Spotted Owl and its habitat; will adversely affect the impaired Hungry Creek subwatershed; and may significantly impact other wildlife.

In contrast, the Forest Service asserts that its finding of no significant impact was reasonable because "the Forest Service and Fish and Wildlife Service biological analyses demonstrate that impacts to wildlife, including the northern spotted owl ... will not be significant. Watershed analysis demonstrates that none of the watersheds in the project area will be significantly affected." (Def.'s Mem. In Supp. Of Mot. For Summ. J. and in Opp'n to Pls.' Mot. For Summ. J. ("Def.'s Mem.") at 10.)

### 1. Northern Spotted Owl

■ The EA concludes that the project "will affect, is likely to adversely affect" the Northern Spotted Owl. (EA at 58, AR 417.) Standing alone, this suggests the need for an EIS. *Ocean Advocates,* 361 F.3d at 1125 (holding that the presence of one intensity factor may be sufficient to deem the action significant in certain circumstances). The Forest Service concludes however, that the effects to NSO would not be significant under NEPA because "the viability of [the NSO] would be maintained across their range by meeting NFP objectives and resource protection measures would limit the effects in both degree and duration." (DN at 10; AR 128.) According to the Forest Service, the

Project's effects will be insignificant because they will not drive the spotted owl into extinction. (*See* Def.'s Reply in Support of Motion for Summ. J. at 7 ("[T]here is no assertion that extinction of the NSP may result from the project.")) There are several problems with this conclusion.

■ First, for purposes of NEPA, a project need not jeopardize the continued existence of a threatened or endangered species to have a "significant" effect on the environment. *See e.g., Greater Yellowstone Coalition v. Flowers,* 359 F.3d 1257, 1275–1276 (10th Cir.2004)(finding the Fish and Wildlife Service's conclusion that construction of housing development and golf course along Snake River would not likely jeopardize the continued existence of the bald eagle was not determinative of the need to prepare an EIS for the project.) Viability is a standard under the ESA and the NFMA, not under NEPA. 16 U.S.C. § 1536(a)(2). (ESA requires federal agencies to ensure their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species."); 36 C.F.R. § 219.19 ("Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area.") Instead, NEPA's "significant effect" analysis is guided by regulations which outline relevant factors for determining whether an action will be significant. *See* supra.

One such factor is "the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(a). Here, the Forest Service concluded that the project

---

of the EA and failure to meet the stated purpose and need. Discussion of Arguments raised in support of plaintiffs' these points is subsumed within the discussion plaintiffs' arguments regarding failure to prepare an EIS and failure to consider an adequate range of alternatives.

"may affect, is likely to adversely affect" the NSO, due to direct owl disturbance and disruption of breeding, as well as destruction and degradation and increased fragmentation of NSO habitat (much of which is designated NSO critical habitat and/or within existing NSO activity centers). (*See* EA at 26–32, AR 385–391.) At a minimum, this finding is an important factor supporting the need for an EIS. *See also Ocean Advocates*, 361 F.3d at 1125 (holding that the presence of one intensity factor may be sufficient to deem the action significant in certain circumstances).

Second, the Forest Service's conclusion that the project's effects, while adverse, will not be significant is based on incomplete and outdated information, which renders the overall conclusions uncertain. 40 C.F.R. § 1508.27(a) (factor supporting determination of significance is "(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks."). The Forest Service concedes it did not conduct current protocol surveys of NSO's within the project area. (EA at 30; AR 389, Wildlife BO at 14; AR 1410.) As a consequence, the Forest Service does not know whether existing NSO "core areas and home ranges ... are active or if proposed treatments would reduce the ability of owls to persist in these areas." (EA at 30; AR 389.) Nor is the Forest Service aware if, in the ten years since protocol surveys were last conducted, additional owl pairs have located in the project area. (*See* BA/BE at 14 (Since there are no current protocol surveys in the project area, there may be additional activity centers.)) Consequently, the Forest Service acknowledged that "the actual effects of implementation of this project on NSO's are unknown." (EA at 30; AR 389.)

The Forest Service asserts that information regarding the presence of owls is unnecessary because it "assumed the presence of owls in preparing the EA." (EA at 30, AR 389.) However, the Forest Service only assumed owl presence for the limited purpose of designing mitigation measures to avoid owl mortality and interference with breeding during timber harvest, *not* for the purpose of supporting its conclusion to conduct the timber sale at all, or in the manner and within the areas described in Alternative 2. In reaching these latter conclusions, the Forest Service relied on ten year old data that, in all likelihood, dramatically misrepresents the number and location of owls within the project area. (See e.g. Wildlife BA/BE at 28, AR 1424; EA at 30, AR 389.) Without updated NSO survey data, the Forest Service has no knowledge regarding whether it plans to conduct timber harvest in areas where NSO's are actively nesting. As a consequence, the effects of the project are highly uncertain and involve unknown risks which could be resolved by updated protocol surveys. *See National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir.2001) ("Preparation of an EIS is mandated where uncertainly may be resolved by further collection of data or where the collection of such data may prevent 'speculation on potential ... effects.'" The purpose of an EIS is to obviate the need for speculation.)(quoting *Sierra Club v. United States Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir.1988) (citations omitted)).

Third, the court is troubled by the Forest Service's representation of the underlying data regarding the use of seasonal restrictions to mitigate adverse impacts on the NSO. The EA states that the Project incorporates a "seasonal restriction ... throughout breeding, fledgling and dispersal periods for habitat modifying activities in units with suitable habitat that don't have current protocol surveys." (EA at 30, AR 389.) This assertion simply is not borne out by the underlying data. In fact,

no seasonal restrictions will be utilized in over half of the harvest units, many containing both high and moderate quality unsurveyed habitat. With the exception of one harvest unit, all logging in critical habitat units will occur without seasonal restrictions. (See Table 5. Pre and post harvest NR and Dispersal Condition by Unit, BA/BE at 27, AR 1423; BA/BE at 30, AR 1426.) Oddly, no seasonal restrictions will be used in many of harvest areas identified by the FWS as most likely to be occupied by new nest sites or relocated owl pairs. (BiOps at 23; AR 639.) For example, no seasonal restrictions are planned for harvest units 43, 44 and 45, which, in addition to being critical habitat, lie within an activity center, KL 1169, where an owl pair was spotted during a non-protocol site survey in 1999. (Maps 2 & 3 Beaver Creek EA with NSO Activity Center Overlay.) [12, 13]

As a result, the EA dramatically overstates the effectiveness of the seasonal restriction in mitigating direct effects to owls. It is impossible to determine whether the EA based its conclusion, that seasonal protocols will mitigate direct impacts on owls, on the EA's misleading summary or the more detailed description of the seasonal restrictions contained in the Wildlife BA/BE. However, the court finds that, as stated in the latter document, the direct effect on the NSO is potentially significant and highly uncertain, particularly in light of the lack of data regarding the current number and dispersal of owls within the project area. See National Parks, supra.

Fourth, the project will result in the loss of 500 acres of high and moderate quality nesting/roosting habitat, within two designated critical habitat units ("NSO CHU"), CA–14 and OR–76. In 477 of the acres harvested, (in Units 41, 42, 421, 107, 43, 44, 45, 462, 463, and 461) "[t]he result of thinning harvest will be an opened stand providing *minimal levels of dispersal habitat.* Riparian reserves and isolated patches will provide the best short-term opportunities for dispersal." (Wildlife BA/BE at 26, AR 1422.)(emphasis added). In short, the affected acres will function marginally, if at all, as NSO dispersal habitat. The EA concludes that loss of this critical habitat is not significant for purposes of NEPA because the CHU's, viewed together, will continue to "provide habitat for reproductively capable owls by retaining large amounts of suitable habitat, and will maintain connectivity between CHU's at the local scale by continuing to provide dispersal habitat." (EA at 31, AR 390.) The fact remains however, that the project will result in a 14% loss of suitable habitat within CHU CA–14. While the CA–14 may still *function* post-harvest, the destruction of a significant percentage of the suitable habitat within the CHU is an important factor supporting the need for an EIS. *See* 40 C.F.R. 1508.27(a)(9)(court should consider "the degree to which the action may adversely affect an endangered or threatened species *or its habitat that has been determined to be critical under the Endangered Species Act.*")(emphasis added).

12. Maps and figures attached to the EA were omitted from the record submitted to the court. The Forest Service provided copies of some maps to the court. However, the notations handwritten on the documents do not correspond to the Table of Contents on the EA, nor is the court in possession of the quantity of maps and figures identified in the EA.

13. This is inconsistent with the stated goal of the seasonal restrictions "to protect known, active NSO nesting areas." (EA at 13, AR 372.) In addition to KL 1169, harvest will occur without seasonal restrictions within the activity center KL 4143, which is another "known, active NSO nesting area."

In support of its conclusion that lost critical habitat is insignificant, the Forest Service also relies on FWS' determination that the "NFP was a reasonable match for critical habitat and would perform the habitat/dispersal functions of critical habitat." (Def.'s Reply at 8; BiOp at 12; AR 628; see also BiOp at 19–20, AR 635–636.) This redundancy of function "reduces the significance of adverse effects to CHU's for [the NSO] ...." *Id.* In short, FWS concluded that the critical habitat was unnecessary because the goals of the CHUs are being met by the redundant NFP reserve system.

Reliance on the NFP reserve system to justify destruction of critical habitat was squarely rejected by the Ninth Circuit in *Gifford Pinchot Task Force v. United States Fish and Wildlife Service*, 378 F.3d 1059, 1075 (9th Cir.2004). In that case, the court deemed arbitrary and capricious a Forest Service's determination that habitat loss would not adversely modify critical habitat for the NSO because the Forest Service relied on the existence of alternative habitat in LSR's established pursuant to the NFP. While noting the overlap between the NFP and critical habitat designated under the Endangered Species Act, the court found that "parallel habitat conservation projects" such as the NFP should not "stand in for the loss of designated critical habitat in the adverse modification analysis." *Id.* at 1076. The court reasoned that the Forest Service's approach would "approv[e] transition away from ESA protections to mere compliance with the broader and perhaps less rigorous NFP." *Id.* Here, FWS determined that the effects of lost critical habitat "have been buffered by adjacent and overlapping LSR's and adjacent wilderness areas." (BiOp at 12, AR 628; BiOp at 20; AR 636.) Similarly, here, the FWP relied heavily on the overlap with the LSR system in reaching its conclusion that the goals of CA–14 and OR–76 would continue to be met after harvest. Specifically, FWS concluded that the CHU's goals of "connectivity and demographic support ... ha[ve] been met by the NWFP reserve system." (BiOp at 20, AR 636.) Consequently, to the extent effects to critical habitat were discounted in reliance on the LSR system, that conclusion is erroneous. (EA at 31, AR 390.)

In summary, the Forest Service's express finding that the project will likely adversely affect the spotted owl, combined with the lack of current survey data, uncertainty regarding the efficacy of mitigation measures, and the effects on critical habitat raise substantial questions regarding whether the project will significantly affect the Northern Spotted owl.

## 2. Hungry Creek Sub Watershed.

Plaintiff next asserts that an EIS was required because the project will have significant effects on the Hungry Creek Subwatershed ("Hungry Creek SW"), which is designated as an impaired watershed. The Hungry Creek SW is entirely granitic, rendering it particularly sensitive to disturbances, such as wildfires and floods, which can cause mudslides that deliver "large amounts of sediment to adjacent streams." (EA at 20, AR 379.) Channel sensitivity in the Hungry Creek SW is considered high because of the number of roads adjacent to the stream and unstable, degraded banks along the main stream of Hungry Creek. (EA at 20, AR at 379.) As a result of the designation that Hungry Creek SW is impaired, "only activities negligible to the condition of the watershed or activities that would have long-term beneficial effects on the watershed, should be implemented." (EA at 20, AR at 379.)

The Forest Service evaluated the Project's effects on the Hungry Creek SW and other subwatersheds within the project area using a modeling approach ("CWE modeling") with three components: a Run-

off Risk model ("ERA") component, a Mass Wasting model and a Surface Erosion model. (*See* Fish BA/BE at 15, AR 991.)

The Runoff Risk model compares watershed disturbance, from sources such as timber harvest, road construction and use, and fuel treatments, against a "threshold of concern", which is "conservatively derived from a consideration of beneficial uses, soil erodibility, stream channel sensitivity, etc." (EA at 20, AR 379; Fish BA/BE at 15, AR 991.) The comparison of the disturbance against the threshold of concern yields a "risk ratio": the smaller the decimal, the lower the risk of watershed damage due to changes to peak flow. (*Id.*) "A Runoff risk ratio approaching 1.0 serves as a 'yellow flag' indicator of increasing susceptibility for peak flow related cumulative effects," such as channel or bank scour, spawning area scour, etc. (*Id.*) While "yellow flag indicators are not necessarily in imminent danger of negative watershed effects," they have "enough disturbance openings to warrant close examination of any proposed additional disturbance." (*Id.*) For Hungry Creek, the current risk ratio is between .75 and .85. After project completion, the risk ratio increases for the first three to five years

to between 1.01 to 1.20, triggering a yellow flag indicator.[14] (EA at 44, AR 403.) Long term, the risk ratio drops to .65.[15] (EA at 25, AR 384.) The EA notes that Alternative 2 was designed in an "attempt[ ] to mitigate the short-term disturbances and remain close to the modeled [risk ratio] for the entire duration of the project." *Id.*

According to plaintiffs, the Forest Service arbitrarily discounted or failed to consider the project's significant short term impacts, focusing instead on the "long term reductions in cumulative watershed effects." (DN at 8, AR 126.)

 The Forest Service counters that it considered the short term increase in the risk ratio to Hungry Creek SW and determined that "[e]ven though the CWE model shows an increased risk for the potential of unacceptable cumulative watershed risks for the short term, the design mitigations eliminate or reduce the risk to a minor adverse effect." (DN at 8, AR 126.) In evaluating the sufficiency of mitigation measures, the court considers whether they constitute an adequate buffer against negative impacts that may result from the activity. *National Parks,* 241 F.3d at 734. Specifically, the court

---

**14.** The Forest Service provides two sets of statistics regarding the risk ratio for Hungry Creek. The discrepancy is based on the use of different assumptions in deriving data for the two tables. The lower numbers, reflected in Table 3–3 do not separately factor in the effect of the seven completed private timber sales within the area. Instead, the data in that table is based on the "assumption" that the ERA (numerator that quantifies disturbance) "over-models the road disturbance in the area" and " the over-modeling is assumed to account for the private harvest activities." By contrast, Table 3–5 separately factors in the private timber sales in the ERA coefficient. The EA notes that Table 3–5 represents "a more conservative approach than that used in the analysis displayed in Table 3–3." (Table 3.5 n. 4, EA at 44, AR 403.) In addi-

tion, the data in Table 3–5 does not assume any recovery in Hungry creek after the first year of harvest. It is unclear to the court which data primarily was relied on by the Forest Service in reaching its finding of no significant impact, since both data are reflected in the EA.

**15.** Table 3–5 does not provide a commensurate long-term impact calculation for Hungry Creek. In addition, a discrepancy exists between the text, which indicates that the long term risk ratio is .69, and table 3–3, which indicates that the long term risk ratio is .65. Since the text refers for documentary support to the table, the court assumes for purposes of this order that table 3–3 accurately reflects the long term risk ratio.

examines "whether the mitigation measures will render such impacts so minor as to not warrant an EIS." *Id.* An agency's mere listing of mitigation measures, without analytical data, is insufficient to support a finding of no significant impact. *Id.* (citing *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1121 (9th Cir.2000)).

Here, the Forest service does nothing more than provide a list of its mitigation measures. (DN at 8, AR 126.) The Forest Service explains that the CWE modeling is "too coarse to reflect the effects" of its mitigation measures. (DN at 8, AR 126.) While CWE modeling is not required, the forest service must present *some* analytical data to support its conclusion that adoption of these measures reduces the risk ratio to "a minor adverse effect." (DN at 8, AR 126.)

*National Parks* is instructive. In that case, the court confronted a challenge to the Park Service's decision not to prepare an EIS prior to increasing the number of cruise ships permitted to enter Glacier Bay national park. *National Parks,* 241 F.3d at 722. The Park Service predicated its finding of no significant impact on the adoption of "mitigation strategies included in this action [which] would significantly reduce environmental effects resulting from vessel entries." *Id.* at 729. The Court found there was "a paucity of analytic data to support the Park Service's conclusion that the mitigation measures would be adequate in light of the potential environmental harms." *Id.* at 734. Consequently, the court rejected the finding of no significant impact as "speculative and conclusory" and ordered the Park Service to prepare an EIS. *Id.* at 735.

Similarly, Forest Service simply describes mitigation measures without further discussion regarding their efficacy, other than to note its analysis was "too coarse" to quantify the measures' effect.

Yet, the inability of CWE modeling to account for the effects of mitigation measures does not relieve the Forest Service of the requirement to prepare an EIS. To the contrary, the Forest Service's lack of information about the ability of mitigation measures to bring the risk ratio below the yellow flag threshold of 1.00 argues in favor of preparing an EIS.

The efficacy of the Forest Service's mitigation measures is further undermined by the fact that its statistical analysis regarding increases to the Runoff Risk "assumes that all actions will occur at one time." (See, e.g., Table 8a Cumulative Watershed Effects Risk Ratios, Fish BA/BE at 31, AR 1007.) In fact, with respect to road closures in Hungry Creek, they are not scheduled to occur until year four, while timber harvest will occur will begin in years one and two. Consequently, reductions in the Runoff Risk from road closures will not mitigate the increases associated with the timber harvest in the short term. The Forest Service does not disclose or analyze the increased Runoff Risk over the short term based solely on projects that will occur during that time period.

Additional uncertainty exists because the Forest Service proceeded with its EA and Decision Notice without environmental baseline data for Hungry Creek and the other subwatersheds within the project area. While the Forest Service did complete an Beaver Ecosystem Analysis in July of 1996, this analysis was relevant to only a minor number of indicators for the environmental baseline. (App. E to Fish BA/BE at 62, AR 1038.) Most indicators are based on "professional judgment." The baseline contains the following qualification: "No recent stream condition inventories have been undertaken, little other information is available, checklist is based primarily on observation, anecdotal information and professional opinion." *Id.*

■ Finally, the court addresses the Forest Service's argument, referenced repeatedly throughout its EA and memoranda in support of this motion, that potential short term impacts to the Hungry Creek SW are tolerable (and thus insignificant) in light of the reduced fire risk associated with project implementation. The Forest Service notes throughout the record that a stand replacing fire would be more detrimental to the Hungry Creek SW than the short term impacts associated with the project. It is unclear precisely how the forest prescriptions proposed in this Project will substantially reduce fire risk in the watershed, considering the entire project is surrounded by private forest lands on which timber harvest continues to *increase* fire risk. Nonetheless, the court does not question the Forest Service's earnest desire to reduce fire risk in our national forests and defers to its conclusion that fire hazard will be reduced. The fact remains, however, that short term impacts to the watershed will occur, and those impacts appear significant and highly uncertain. Neither the net long term benefits of the program, nor the risk associated with not implementing the project, relieve the Forest Service of its duty to conduct an EIS when the project will have significant environmental impacts. 40 C.F.R. § 1508.27(a) ("Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.")

Accordingly, the court finds that plaintiff has raised substantial questions regarding whether the project will significantly impact the Hungry Creek SW.

### 3. Impact On Other Wildlife.

Plaintiffs next contend that effects on Sensitive Species, specifically the Peregrine Falcon, Northern Goshawk, Willow Flycatcher, Pacific Fisher, California Wolverine, American Marten, Pallid Bat, Townsend's Big Eared Bat, Great Gray Owl, Northwestern Pond Turtle, Foothill Yellow-legged Frog, and Cascade Frog, are highly uncertain in light of the Forest Service's failure to conduct protocol surveys of these species. The Standards and Guidelines ("S & G's") in the Klamath National Forest Plan provide:

> Sensitive Species: Project areas should be surveyed for the presence of Sensitive species before project implementation. If surveys cannot be conducted, project areas should be assessed for the presence and condition of Sensitive species habitat.

(Klamath National Forest Plan, 11/21/01 at 4–22, AR 3250.)

Initially, the Forest Service points out that protocol surveys were conducted for the Northern Goshawk. (Def.'s Mot. at 31.) This statement is partially accurate. Protocol surveys were conducted in two Goshawk management areas within the Project area, both of which will be eliminated by timber harvest. However, no protocol surveys have been conducted for the remainder of the project area.[16]

■ As to the remaining species, the Forest Service acknowledges that "the rec-

---

**16.** While the project does incorporate survey protocols for two known mine shafts which offer potential habitat for the Townsend's Big-Eared Bat. Specifically, the project incorporates a 250–foot buffer zones around the two known mining adits. The mines will be surveyed to protocol for the presence of bats prior to implementation of the project, and, only if the mines are unoccupied will the buffer zones be lifted. While this procedure may prevent disturbance to Townsend Big Eared Bat colonies in the two identified locations, other potential habitat exists within the project area, for which no buffer zones or protocol surveys are planned.

ord does not explicitly state the reasons why the Forest Service was unable to conduct surveys...." (Def.'s Mot at 31–32.) However, the Forest Service argues that population surveys are not required where the Forest Service assumes the presence of species because the purpose of surveys is "merely to confirm whether sensitive species are present." (*Id.*)

> If species are present, then habitat assessment should go forward. Because the Forest [Service] assumed the presence of all sensitive species and conducted habitat assessments accordingly, the Forest Plan has been complied with, and despite Plaintiffs [sic] contentions to the contrary, no uncertainty as to effects on these species exists.

(*Id.*) This interpretation is inconsistent with the plain text of the guideline, which permits reliance on habitat assessments only when the Forest Service is unable to conduct species surveys.

However, in *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1154 (9th Cir. 1998.), the court deferred to the Forest Service's use of habitat analysis as a proxy for population surveys in the context of the NFMA, even where such surveys were expressly required by the terms of the applicable forest plan, so long as the Forest Service demonstrates that "no appreciable habitat disturbance" will result from the project. *Id.* at 1154. *See also* discussion *infra*, section II(A). Assuming *Thomas* is applicable in the NEPA context, the Forest Service's use of habitat analysis would not be arbitrary and capricious so long as it performed further analysis to demonstrate that no appreciable habitat disturbance will occur.

As to the Canada Lynx, Peregrine Falcon, American Marten or Great Gray Owl, the Forest Service determined that no habitat was present within the project area (EA at 33, AR 1429.) Consequently, no population surveys were required because no appreciable habitat disturbance will occur.

As to the remaining species, the Forest Service cannot rely on habitat as a proxy because it determined, based on analysis of project affects on species habitat, that the project will result in appreciable disturbance to the habitat of all Sensitive Species. (Wildlife BA/BE at 33–41, AR 1429–1437.) For example, implementation of the proposed timber harvest will result in an overall loss of 794 acres of habitat for the California Wolverine. (Wildlife BA/BE at 35, AR 1431.) Currently, the entire project area could be considered potentially suitable habitat for the California Wolverine, though there are no historic records of the species in the area. (Wildlife BA/BE at 21, AR 1417.) Post-harvest, the "short-term potential for [the Wolverine] occurring in the area will be very limited." (Wildlife BA/BE at 35, AR 1431.) In light of the significant effect this project will have on habitat for the California Wolverine, as well as other Sensitive Species within the project area, population surveys should have been conducted in compliance with the KLRMP.[17]

Accordingly, the Forest Service's failure to conduct surveys for the remaining Sen-

---

17. In addition, for the Northern Goshawk, population surveys are mandated by another more specific Standard and Guideline in the KLRMP which provides that "[p]lanned timber sale areas should be surveyed to Region 5 protocol for goshawks for a minimum of 1 season (intensive protocol) or two seasons (broadcast protocol)." (KLRMP at 4–29, AR 3257.) This standard is extremely specific, as to both the type of surveys required and their timing. Unlike the more general survey requirement for all Sensitive Species, this language simply cannot be construed to permit habitat analysis to stand in for population surveys. Moreover, the project will result in appreciable disturbance to Northern Goshawk habitat, as it will eliminate two current Northern goshawk management areas.

sitive Species or explain why such surveys could not be conducted was arbitrary and capricious and in violation of the NEPA and KLRMP.

## B. FAILURE TO ANALYZE AN ADEQUATE RANGE OF ALTERNATIVES

 Plaintiffs also challenge the adequacy of the EA, asserting that it failed to address an adequate range of alternatives. NEPA mandates that an agency consider and discuss the range of all reasonable alternatives to the proposed action, to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. 1502.14. An agency is not required to extensively analyze alternatives that do not meet the purpose and need of the project. *Laguna Greenbelt, Inc. v. United States Dept. of Trans.,* 42 F.3d 517, 523–525 (9th Cir.1994). Nor, however, can the agency narrowly define its purpose and need so as to winnow down the alternatives until only the desired one survives. *See Muckleshoot Indian Tribe v. United States Forest Service,* 177 F.3d 800, 814 n. 7 (noting in the EIS context that "[o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose and need so slender as to define competing reasonable alternatives out of consideration . . . . .").

Here, the Forest Service evaluated three action alternatives: (1) no action, (2) Alternative 1 and (2) Alternative 2, which modifies Alternative 1 primarily in order to reduce impacts on the impaired Hungry Creek SW. The two alternatives analyzed by the Forest Service are nearly identical, as is evidenced by the fact that the Forest Service analyzes them together throughout most of the EA. Both proposals contain identical quantities of timber harvest fuels treatment, pre-commercial thinning, and

underburning, the largest component of the project in terms of impact. Alternative 2 differs in that it would spread timber harvest in the Hungry Creek SW over two years instead of one; change from tractor piling of underbrush to hand piling on 155 acres to reduce the risk of compaction and erosion of hillsides; decommission an additional 3.5 miles of road and close one additional road segment. (Table 2–2, EA at 9, AR 368.) The similarity between the two action alternatives raises concern that the Forest Service may not have taken the requisite "hard look."

The Forest Service's stated reason for rejecting all proposed alternatives which would have eliminated or reduced the amount of timber harvest was that "they would have been uneconomical and thereby limited funds for restoration work." (Def.'s Mot. at 36; EA at 16, AR 375.) The Forest Service explains that "part of the Purpose and Need includes utilizing economic value of timber harvest to help finance the net costs of watershed improvement treatments and [pre-commercial thinning]." (EA at 16, AR 375.) According to the Forest Service, the sale of 5.5 million board feet of lumber will generate is $541,000 for use on watershed improvement and forest health projects. Presumably, this revenue is required to conduct watershed improvement and forest health projects. Yet nowhere in the EA does the Forest Service provide any analysis regarding the amount of revenue lost under each of the various alternative approaches, how much it will cost to complete the desired improvement projects, and what percentage of required funding must to be generated through timber sales. Rather, it appears the Forest Service simply dismissed out of hand any proposal which would have reduced the amount of timber harvest.[18] This does not

18. When asked during oral argument, counsel for the Forest Service was unable to elaborate

constitute a hard look at reasonable alternatives. Accordingly, the court finds that the Forest Service arbitrarily and capriciously failed to analyze an adequate range of alternatives or to explain sufficiently why other alternatives would not accomplish the project's purpose and need.

For the reasons stated above, the court finds that the Forest Service abused its discretion in not preparing an EIS for the Beaver Creek Project.

## II. NATIONAL FOREST MANAGEMENT ACT

Plaintiffs also seek a declaration that the project violates the National Forest Management Act in that it is inconsistent with the NFMA, applicable forest planning documents, the Northwest Forest Plan and Aquatic Conservation Strategy.

### A. Violation of NFMA, NFP and KLMRP [19]

According to plaintiffs, the Forest Service violated the NFMA's viability and diversity requirements by not conducting population surveys of Management Indicator Species. The NMFA provide that:

Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning areas. In order to insure that viable populations will be maintained, habitat must be provided to support, at least a minimum number of reproductive individuals and that habitat must be well distributed so that those reproductive individuals can interact with others in the planning area.

36 C.F.R. § 219.19.

This regulation has been interpreted to require that the Forest Service "ensure a proposed action will not cause a loss of viability of an existing species." Inland Empire Public Lands Council v. United States Forest Service, 88 F.3d 754, 761 (9th Cir.1996.) To implement this mandate, NFMA developed the concept Management Indicator Species ("MIS"). 36 C.F.R. § 219.19(a)(1).[20] Rather than monitor every species present within a project area, agencies may monitor the MIS, which acts as a proxy to assess the condition of all species within a species association to determine whether they are satisfying the NFMA's viability and diversity requirements. Id. The KLRMP established 27 MIS identified with six species associations, three of which are potentially impacted by the project: the Hardwood Species Association MIS are the Acorn Woodpecker and Western Gray Squirrel; the River Stream Species Association MIS are the Rainbow trout, Steelhead trout, Tailed frog, Cascades frog, American dipper, Northern Water shrew, and Long–

on the nexus between timber sale proceeds and watershed improvement projects.

19. Plaintiffs initially assert that the project "fails to comply with NFMA's viability and diversity requirements; the LRMP standards and guidelines for soil protection; and the Aquatic Conservation Strategy in the ROD." (Pls.' Mot. at 37.) However, plaintiffs provide support for only their assertions with regard to the NFMA viability and diversity requirements and the ACS. The court does not address plaintiffs' remaining arguments.

20. 36 C.F.R. 219.19(a)(1) provides: In order to estimate the effects of each alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall b e identified and selected as management indicator species and the reasons for their selection will be stated. These species shall be selected because their population changes are believed to indicate the effects of management activities.

Tailed vole; the Snag Species Association MIS are the Red Breasted sapsucker, Hairy woodpecker, White-headed woodpecker, Vaux's swift, Downy woodpecker, Pileated woodpecker, and Black-backed woodpecker. (Beaver Creek MIS Assessment at 1–2, AR 490–91.)

■ Plaintiff specifically contests the Forest Service's decision not to conduct population surveys of MIS in preparation for the project. Instead, the Forest Service analyzed MIS habitat as a proxy for MIS population. Parties disagree as to whether population surveys, in addition to habitat analysis are required by the NFMA.

Implementing regulations for the NFMA provide that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6). In addition, "planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(6). Similar language appears in the KLRMP: "Population trends of the management indicator species will be monitored and relationships to habitat changes determined." (KLRMP at 5–3, AR 3377.) While this language appears to require both habitat analysis and MIS population surveys, the Ninth Circuit has interpreted 36 C.F.R. § 219.19(a) to permit use of habitat as a proxy for population surveys in certain circumstances. *Inland Empire,* 88 F.3d at 761. In that case, the court confronted a challenge to the Forest Service's proposed timber sale in the Kootenai National Forest in northwestern Montana. In evaluating the effect of the project on species viability within the project area, the Forest Service did not conduct population surveys. Rather, it "examined each proposed alternative to see how many acres each type of relevant habitat would remain after timber was harvested," and concluded that "a species would remain viable as long as the threshold percentage of each type of habitat remaining in the chosen alternative was greater than the percentage required for that species to survive." *Id.* at 759–760. The court recognized that such an approach "necessarily assumes that maintaining the acreage of habitat necessary for survival would in fact assure a species' survival." *Id.* at 761. However, the court found the assumption "eminently reasonable" and concluded that the habitat analysis as a proxy for population surveys was not arbitrary and capricious. *Id.*

Similarly, in *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146 (9th Cir.1998), the Ninth Circuit upheld use of habitat as a proxy for population where the Forest Service performed further analysis that demonstrated the project would result in "no appreciable habitat disturbance." *Id.* at 1154.

The Court confronted the proxy on proxy issue again in *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957 (9th Cir.2002). Distinguishing both *Inland Empire* and *Thomas,* the *Rittenhouse* court held that use of habitat as a proxy was inappropriate in that case because the methodology used for monitoring habitat was unsound. *Id.* at 972. Specifically, the court noted that the Forest Service's methodology for identifying old growth habitat was demonstrably inaccurate and could not "reasonably ensure viable populations of the species at issue." *Id.*

Here, the Forest Service relied on habitat as a proxy for population for all MIS within the project area. Plaintiff asserts that the Forest Service cannot rely on habitat analysis, as did the defendants in *Inland Empire* because "that opinion was based on the Forest Service's proof that it had conducted population trend analysis to ensure that the use of habitat review as a

proxy for species surveying was scientifically sound." (Pls.' Reply at 2.) To the contrary, the court in *Inland Empire* recognized that the Forest Service's approach was based on "an assumption" that "maintaining the acreage of habitat necessary for survival would in fact assure species' survival." *Inland Empire*, 88 F.3d at 761. Nowhere does *Inland Empire* address the methodology used by the Forest Service in determining the amount of acreage necessary for species' survival; it appears to defer to the Forest Service's expertise on that issue. In this case, the Forest Service relied on the habitat requirements outlined in the KLRMP and associated EIS. (See KNF Project Level Analysis Species Natural History Summary at 1, AR 485; KLRMP at 4–29—4–34, AR 3257—3262.) This habitat data was updated to incorporate current research information, as required by the KLRMP. (KLRMP 4–29, AR 3257.) Based on this data, the Forest Service quantified the amount of acreage that would be degraded and/or destroyed as a result of the project under each alternative and determined that as to each species, viability would be maintained across the species' range.

Like in *Inland Empire*, the Forest Service assumed that the habitat requirements will be sufficient to ensure species viability. Under *Inland Empire*, this approach is not arbitrary and capricious.[21]

■ Nonetheless, plaintiffs assert that the Forest Service's methodology was unsound, drawing analogy to the defendants in *Rittenhouse*. Specifically, plaintiffs cite the 2001 KNF Monitoring and Evaluation Report, which concluded that "there isn't a clear link between some species presence or abundance and changes in habitat conditions." (Klamath National Forest FY 2001 Monitoring and Evaluation Report at 8, Exh. A attached to Pls.' Resp. to Def.'s Mot. for Summ. J. and Reply in Support of Mot. for Summ. J. ("Pls.' Reply") at 3.)[22] However, the 2001 KNF Monitoring Report does not undermine the population-habitat correlations for the specific species analyzed in this case. Rather it makes a generalized statement that the correlation is not clear for "some species." By contrast, in *Rittenhouse*, the court found that the methodology used *in that case* was clearly unsound: the "Forest Service's methodology for dedicating old growth is so inaccurate that it turns out there is no

---

**21.** Plaintiffs also contend that *Inland Empire* is distinguishable because that case dealt only with the population survey requirements under the NFMA, where here, the KLRMP also requires population surveys. However, this distinction was addressed in Thomas, which found that "as with the federal regulations in *Inland Empire*, we defer to the Forest Service's expertise in interpreting its [land management plan]." *Thomas*, 137 F.3d at 1154.

**22.** The KNF 2001 Monitoring and Evaluation Report, dated Sept. 23, 2002, was not included in the Administrative Record. However, it was issued prior to the Forest Service's Decision Notice in this case and therefore should have been included in the record. The Forest Service did not object to plaintiffs' attachment of this document as an exhibit in support of their Reply. While the general rule regarding review of agency decisions limits the court to

consideration of administrative record, "the court may consider, particularly in highly technical areas, substantive evidence going to the merits of the agency's action where such evidence is necessary as background to determine the sufficiency of the agency's consideration." *Inland Empire*, 88 F.3d at 760 n. 5 (quoting *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988), cert. denied, *AFL–CIO v. Love*, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989)). See also *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436–7 (9th Cir. 1988), as amended by 867 F.2d 1244 (9th Cir.1989) (acknowledging an exception to the record rule for APA cases to determine "whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision."). See also French, Susannah, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 Cal. L.Rev. 929, 953 (July 1993).

old growth at all in management area 35, where the Forest Service has purported to dedicate 1280 acres of old growth." *Rittenhouse,* 305 F.3d at 972. Without more specific and detailed information regarding the failures in the Forest Service's methodology, the court cannot say that it was unsound.

 However, the Ninth Circuit further refined the test for use of habitat as a proxy for population analysis in *Thomas.* Noting that the project in *Inland Empire* had little effect on the habitat of the species in that case, the court upheld use of habitat as a proxy for population where the Forest Service performed further analysis that demonstrated the project would have "no appreciable habitat disturbance." *Id.* at 972.

Applying *Thomas* here, it appears the Forest Service has performed further analysis to demonstrate that the project will have no appreciable effects on habitat for some of the MIS species. Specifically, as to the Hardwood Species Associations, the Forest Service concluded that "habitat for acorn woodpeckers and Gray squirrels will not be removed with the proposed action." (MIS Assessment at 4, AR 493.) While some degradation of six acres of habitat will occur as a result of removal of large conifers and woody materials on forest floor, hardwood trees are not targeted for harvest, and the "cumulative effects to habitat will be minimal." (*Id.*) Likewise, as to the River/Stream Species Association, the Forest Service found that the project will not affect to a measurable degree habitat elements for the Tailed Frog, Cascades frog, American dipper, Northern Water shrew, Long tailed vole Rainbow Trout, and Steelhead Trout. Consequently, the court finds that because the Forest Service conducted further analysis to demonstrate that no appreciable

habitat disturbance will occur it was not arbitrary and capricious to use habitat as a proxy for population surveys.

As to habitat for the Snag Species Association MIS, including the Red Breasted sapsucker, Hairy woodpecker, White-headed woodpecker, Vaux's swift, Downy woodpecker, Pileated woodpecker, and Black-backed woodpecker, the Forest Service determined that "approximately 758 acres within units will be reduced from high capability habitat to moderate capability [and] ... [h]abitat on 36 acres within GTR and OR units will be reduced to low capability," resulting in degradation of approximately 20% of the suitable habitat within the project area. (MIS Assessment at 12, AR 501.) In light of private timber harvests within the project area, which have destroyed 7% of suitable snag species habitat on private land and degraded the remaining 93%, the impact of this project appears appreciable. Consequently, under *Thomas,* population surveys should have been performed.

Accordingly, the court holds that the Forest Service's use of habitat analysis as a proxy for population surveys was not arbitrary and capricious with respect to the Hardwood Species Association MIS and the River/Stream Species Association MIS. However, because the habitat of the Snag Species Association MIS, may be appreciably affected, use of habitat as a proxy for population surveys was arbitrary and capricious.

### 1. Aquatic Conservation Strategy

 The Aquatic Conservation Strategy is a component of the NFP, intended to "restore and maintain the ecological health of watersheds and aquatic ecosystems." There are nine specific objectives in the ACS for restoring and improving watersheds.[23]

---

**23.** The nine ACS objectives are as follows: (1) Maintain and restore the distribution, diversi-

The NFP provides the following guidance to agencies regarding compliance with the ACS:

In order to make a finding that a project or management action "meets" or "does not prevent attainment" of the Aquatic Conservation Strategy objectives, the analysis must include a description of the existing condition, a description of the range of natural variability of the important physical and biological components of a given watershed, and how the proposed project or management action maintains the existing condition or moves it within the range of natural viability.

(NWFP ROD Basis of Standards B–10, AR 3681.)

The court has found that the Forest Service violated NEPA by arbitrarily and capriciously disregarding and discounting short term impacts to the Hungry Creek SW. *See* supra I(2). For similar reasons, the Forest Service violated the NFMA by failing to demonstrate how the Project maintains the existing condition or moves it within the range of natural viability. (NFP ROD B–10, AR 3681.) The Forest Service acknowledges the project will increase the Runoff Risk for the Hungry

Creek SW above acceptable thresholds for three to five years after the project is implemented. This appears to underestimate the total increased risk, because the analysis assumes that beneficial road closures occur in the short term, when, in fact, road closures will occur in year four or later. *See supra*, section I(A)(2). Consequently, as to the short term impacts to Hungry Creek, the Forest Service has failed to demonstrate how the proposed project maintains existing conditions or moves Hungry Creek within the range of natural variability. *See Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Service*, 253 F.3d 1137 (9th Cir.2001), amended and superseded by, 265 F.3d 1028 (9th Cir.2001)(finding NMFS' failure to evaluate the short-term impacts was arbitrary and capricious and noting that "[w]e find nothing in the record to authorize NMFS to assume away significant habitat degradation.")

## III. INJUNCTION

■ Plaintiffs seek to enjoin the Forest Service from implementing the Project until a full EIS is prepared. To determine whether injunctive relief is appropriate, the court applies the traditional balance of

---

ty, and complexity of watershed- and landscape-scale features to ensure protection of the aquatic systems to which species, populations, and communities are uniquely adapted; (2) Maintain and restore spatial and temporal connectivity between watersheds ..., (3) Maintain and restore the physical integrity of the aquatic system, including shorelines, banks and bottom configurations; (4) Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems. Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction and migration of individuals composing aquatic and riparian communities; (5) Maintain and restore the sediment regime under which aquatic ecosystems evolved...; (6) Maintain and restore in-stream flows suffi-

cient to create and sustain riparian, aquatic, and wetland habitats, and to retain patterns of sediment, nutrient, and wood routing....; (7) Maintain and restore the timing, variability, and duration of floodplain inundation and water table elevation in meadows and wetlands; (8) Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands to provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration, and to supply amounts and distributions of CWD sufficient to sustain physical complexity and stability; and (9) Maintain and restore habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species. (EA at 59–61, AR 1035–1037.)

1094

harms analysis. *National Parks*, 241 F.3d at 737 (quoting *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir.1995)). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

Here, plaintiffs have made the requisite showing to obtain injunctive relief. The court has concluded that the Forest Service is required to conduct a full EIS because plaintiffs have demonstrated that substantial questions exist regarding whether the project will significantly affect the environment. *See* Section I, *supra.* "Where an EIS is required, allowing a potentially environmentally damaging project to proceed prior to its preparation runs contrary to the very purposes of [NEPA]." *Id.* Accordingly the Forest Service is enjoined from implementing the Beaver Creek Project until a full EIS is prepared.

## CONCLUSION

For the reasons stated above, the court finds the following:

(1) The Forest Service violated NEPA by failing to prepare a full EIS despite substantial questions regarding whether the project will significantly affect the environment.

(2) The Forest Service did not abuse its discretion by analyzing species' habitat as a proxy for population surveys of the Hardwood Species Association MIS and the River/Stream Species Association MIS.

(3) The Forest Service abused its discretion in using species' habitat as a proxy for population surveys of the Snag Species Association MIS in violation of the National Forest Management Act.

(3) The Forest Service violated the National Forest Management Act by failing to demonstrate how the proposed project or management action maintains the existing condition or moves it within the range of natural viability.

Based upon the above findings, the Court hereby enjoins the Forest Service from implementing the Beaver Creek project until a full EIS is prepared in conformity with NEPA and the NFMA.

IT IS SO ORDERED.